762 F.2d 1053
 246 U.S.App.D.C. 74
 SALT RIVER PROJECT AGRICULTURAL IMPROVEMENT AND POWER
DISTRICT, Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Southern Pacific Transportation Company, Intervenor.
 No. 83-2331.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 11, 1985.
Decided May 31, 1985.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Richard S.M. Emrich, Chicago, Ill., for petitioner.
 Henri F. Rush, Associate Gen. Counsel, I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Robert S. Burk, Acting Gen. Counsel, I.C.C., John J. Powers, III, George Edelstein, Attys., Dept. of Justice, Timm L. Abendroth, and Lawrence H. Schecker, Attys., I.C.C., Washington, D.C., were on the brief, for respondents. John P. Fonte, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent U.S. of America.
 Louis P. Warchot, San Francisco, Cal., with whom Stuart E. Vaughn, Chicago, Ill., was on the brief, for intervenor. Thormund A. Miller, San Francisco, Cal., also entered an appearance for intervenor.
 Before TAMM and WALD, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge TAMM.
 Concurring opinion filed by Circuit Judge WALD.
 TAMM, Circuit Judge:
 
 
 1
 Salt River Project Agricultural Improvement and Power District (Salt River) petitions this court to review a final decision of the Interstate Commerce Commission (ICC or Commission) that Southern Pacific Transportation Company (Southern Pacific) lacks market dominance. As a result of its market dominance determination, the ICC lacks jurisdiction under 49 U.S.C. Sec. 10709(b) (1982) to determine the reasonableness of the rail rates charged by Southern Pacific for delivery of fuel oil from three refineries in California to two of Salt River's fourteen generating facilities in Arizona. Salt River contends, inter alia, that the ICC's determinations are arbitrary and capricious and not supported by substantial evidence. We agree that the ICC's findings on intramodal and intermodal competition lack record support, but we uphold its determination that Southern Pacific lacks market dominance on the basis of the ICC's findings on product and geographic competition.
 
 I. BACKGROUND
 
 2
 Salt River, a political subdivision of the State of Arizona, is a public utility providing electricity to over 341,000 residential, commercial, industrial, and agricultural customers in Maricopa, Gila, and Pinal Counties. It generates power at 14 generating stations with an aggregate generating capacity of 3,156 megawatts. Six of the plants burn coal, five use hydro power, and the other three can burn either fuel oils or natural gas.
 
 
 3
 Salt River generates power at three levels. Its base load is generated by its coal burning plants. When demand exceeds these plants' capacity, power is supplied by its intermediate level units. When the output of the intermediate units is exceeded in emergencies or during sudden but short demand surges, Salt River's peak load units are activated.
 
 
 4
 The two plants involved in this case, which together account for approximately 19% of Salt River's generating capacity, are the Kyrene Steam Plant at Helena, Arizona, and the Santan Generating Plant at Gilbert, Arizona. Kyrene consists of two steam units that use either residual fuel oil or natural gas, and four simple cycle combustion turbines that burn either distillate fuel oil or natural gas. The Kyrene steam units operate at the intermediate level and the turbines operate at the peak level. The Santan plant consists of four combined cycle turbines, similar to the Kyrene combustion turbines. Until 1981, Santan could use only distillate fuel oil. In that year, however, the plant was converted and can now burn either distillate fuel oil or natural gas. The Santan turbines operate at the peak level.
 
 
 5
 The distillate and residual fuel oils used by Salt River must meet exact specifications to protect its generating equipment and satisfy environmental emission standards. In recent years, it has obtained suitable distillate fuel oil from nine refineries and residual fuel oil from twelve refineries. Salt River transports fuel oil to Kyrene and Santan via pipeline, rail, and truck. The preferred mode of transportation for distillate fuel oil is via Southern Pacific Pipe Lines, Inc. (SPPL), an affiliate of Southern Pacific. SPPL can move distillate from Watson and Norwalk, California to Salt River's tank farm in Phoenix. The distillate is then trucked to Santan and Kyrene. SPPL also has an east line to Phoenix from El Paso, Texas. The aggregate pipeline-truck transportation cost is far lower than transporting oil via rail or truck.
 
 
 6
 Salt River prefers to transport the remainder of its distillate and, because residual fuel oil cannot be transported by pipeline, all its residual shipments by rail. Consistent with that preference, Salt River maintains its own fleet of 193 Jumbo Class (23,500 gallon) rail tank cars. Southern Pacific can transport distillate and residual fuel oil from three refineries located in Bakersfield, Harperstown, and Maltha, California, to Salt River's Kyrene and Santan plants. The Atchison, Topeka and Santa Fe Railway Company (Santa Fe) serves each of the three origins, but not the destinations. For the remainder of its fuel oil needs, Salt River uses trucks. Because motor carrier rates are significantly higher than either pipeline-truck or rail rates, however, trucks are the least-preferred mode of transportation.
 
 
 7
 Salt River determines whether to use natural gas or fuel oils based on the price and availability of the fuels. In recent years, it has increasingly relied on natural gas because it is readily available and much less expensive than fuel oils.[1] Consequently, Salt River last used Southern Pacific to transport fuel oils during the winter of 1979 when it experienced an emergency need for fuel after its coal supplies froze. Natural gas was curtailed so Salt River was forced to rely on oil. Joint Appendix (J.A.) at 23.
 
 
 8
 Even though it was not currently shipping oil via Southern Pacific, on March 27, 1981, Salt River filed a complaint challenging the reasonableness of Southern Pacific's rates on its routes from Bakersfield, Harperstown, and Maltha (hereinafter referred to as the Southern Pacific origins) to Kyrene and Santan. Unless Salt River filed its complaint at that time, Southern Pacific's rates would have been deemed reasonable under the recently passed Staggers Rail Act of 1980 (Staggers Act), Pub.L. No. 96-448, 94 Stat. 1895 (codified at 49 U.S.C. Secs. 10101a et seq. (1982)). Section 229 of the Staggers Act allowed shippers and receivers 180 days from the effective date of the Act (October 1, 1980) to challenge the reasonableness of existing railroad rates. See 49 U.S.C. Sec. 10701a note (1982); Arizona Public Service Co. v. United States, 742 F.2d 644, 647 (D.C.Cir.1984).
 
 
 9
 Under the regulatory scheme, the ICC may not examine the reasonableness of rates unless it first determines that the railroad is market dominant. 49 U.S.C. Sec. 10709(b) (1982). The ALJ found that Southern Pacific is market dominant but held that the rates had not been shown unreasonable. Salt River appealed the reasonableness determination, and Southern Pacific appealed the market dominance determination. The ICC Review Board, considering evidence of the four types of competition set forth in Ex Parte No. 320 (Sub-No. 2), Market Dominance Determinations and Consideration of Product Competition, 365 I.C.C. 118 (1981), reversed the ALJ and found that Southern Pacific lacks market dominance and that the ICC therefore has no jurisdiction to determine the reasonableness of the rates. Salt River petitioned this court for review of that determination.
 
 II. DISCUSSION
 A. The Review Board's Jurisdiction
 
 10
 Salt River argues, as a threshold matter, that Southern Pacific's administrative appeal of the ALJ's initial decision was improper under the ICC's rules of practice and therefore the Review Board acted ultra vires. In essence, Salt River argues that Southern Pacific merely asked the Review Board to reweigh the evidence of market dominance, in contravention of ICC regulations limiting the issues that can be raised on appeal to factual, legal, policy, or procedural errors.[2]
 
 
 11
 We reject this argument. Southern Pacific challenged the ALJ's market dominance determination on the grounds that the ALJ "fail[ed] to consider properly evidence of product [and geographic] competition in accordance with the Commission's market dominance guidelines." J.A. at 167. Under the Staggers Act, a threshold finding of market dominance is necessary to the Commission's jurisdiction to determine whether the railroad's rates are reasonable. 49 U.S.C. Sec. 10709(b). Whether a railroad is market dominant is a legal conclusion based on evidence submitted in accordance with the Commission's guidelines. A finding of market dominance is therefore a "necessary legal conclusion." 49 C.F.R. Sec. 1115.2(b)(2). Southern Pacific, though not couching its appeal in the precise words of the regulations, essentially challenged as "contrary to law" the ALJ's market dominance determination. Id. The Review Board therefore lawfully acted on Southern Pacific's administrative appeal.
 
 B. The Standard of Review
 
 12
 The parties also dispute the proper standard of review in this case. Salt River contends that the "substantial evidence" test of 5 U.S.C. Sec. 706(2)(E) applies as well as the "arbitrary and capricious" test of 5 U.S.C. Sec. 706(2)(A).[3] The Commission argues that only the "arbitrary and capricious" test applies because there is no requirement that the railroad rate proceedings be "on the record."
 
 
 13
 In Arizona Public Service Co. v. United States, 742 F.2d 644, 649 (D.C.Cir.1984), we expressly stated that both standards apply in reviewing a determination that a railroad lacks market dominance.[4] As we have noted previously, however, "the difference, if any, between the [two standards] is limited, especially in a regulatory field as empirically-based as ratemaking." Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486, 1499 n. 39 (D.C.Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984). See also Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System, 745 F.2d 677, 684 (D.C.Cir.1984) ("We have noted on several occasions that the distinction ... is 'largely semantic.' ") (citations omitted).
 
 
 14
 The scope of review under the "arbitrary and capricious" standard is narrow, and the court is not to substitute its judgment for that of the agency. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The agency must, however, "examine[ ] the relevant data and articulate[ ] a reasoned explanation for its action including a 'rational connection between the facts found and the choice made.' " Farmers Union Central Exchange, Inc., 734 F.2d at 1499 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Under the "substantial evidence" standard, the reviewing court must determine "whether the record, taken as a whole, contains such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Department of Transportation, Federal Highway Administration v. ICC, 733 F.2d 105, 110 (D.C.Cir.1984) (citations omitted).
 
 C. The Market Dominance Determination
 
 15
 Under the Staggers Act, the ICC has no jurisdiction to examine the reasonableness of a railroad's rates unless it first determines that the railroad has "market dominance over the transportation to which the rate applies." 49 U.S.C. Sec. 10709(b).[5] "Market dominance" is defined as "an absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. Sec. 10709(a) (1982). In Ex Parte No. 320 (Sub-No. 2), Market Dominance Determinations and Consideration of Product Competition, 365 I.C.C. 118 (1981) (hereinafter cited as Market Dominance Determinations),[6] the ICC announced four types of competition to be considered in determining whether a railroad is market dominant: 1) intramodal, 2) intermodal, 3) product, and 4) geographic competition. The ICC also set forth guidelines for submitting evidence pertaining to the presence or absence of each of the four types of competition. In general, the evidence called for is designed to show whether a shipper has feasible alternatives to the railroad. Id. at 131. We now consider whether, based on these guidelines, the ICC's determination that Southern Pacific lacks market dominance is arbitrary and capricious or unsupported by substantial evidence.
 
 1. Intramodal Competition
 
 16
 Intramodal competition is competition between two or more railroads transporting the same commodity from the same origin to the same destination. Market Dominance Determinations, 365 I.C.C. at 132. Santa Fe Railway Company serves each of the Southern Pacific origins, but it does not serve either the Kyrene or Santan plants. Santa Fe serves Phoenix, so the fuel oil conceivably could be transported via Santa Fe to Phoenix and then via trucks to Kyrene and Santan.[7] Because there is no evidence that Salt River has ever used this option, Southern Pacific did not argue that it faces intramodal competition, and the ALJ found that none exists. The Review Board reversed the ALJ's findings for the following reasons:
 
 
 17
 The fact that complainant has never used Santa Fe's services for [its emergency fuel oil] shipments does not preclude a finding that Santa Fe is an available competitive alternative for this traffic, at least to the extent of rail-motor shipments.... Santa Fe could interchange this traffic at Phoenix with tank trucks for transportation to Gilbert or Helena. The record indicates that several tank truck carriers operate between those points.
 
 
 18
 J.A. at 176.
 
 
 19
 Market Dominance Determinations permits a finding of effective competition even though a particular transportation alternative has never been used. See 365 I.C.C. at 131 ("We emphasize that it need not be demonstrated that transportation alternatives ... have actually been used in the past."). The guidelines, however, clearly require findings on the relative feasibility and costs of such potential alternatives. Id. at 132. The Review Board made no such findings here, nor could it have on the record before it. As mentioned above, the challenged railroad itself submitted no evidence and did not argue that it faces intramodal competition. The Review Board relied on a Santa Fe-motor carrier option, but there is no record evidence on the feasibility of transloading fuel oil from Santa Fe to motor carriers at Phoenix for a subsequent delivery haul of fourteen miles to Kyrene or twenty-one miles to Santan, nor is there evidence of the cost of those alternatives. In short, the mere possibility that Salt River "could" use a Santa Fe-motor carrier alternative falls far short of the required finding that the transportation alternative constitutes effective competition. Because the Review Board "entirely failed to consider an important aspect of the problem," Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), its conclusion with respect to intramodal competition is arbitrary and capricious.
 
 2. Intermodal Competition
 
 20
 Intermodal competition is "competition between rail carriers and other modes for the transportation of a particular product between the same origin and destination." Market Dominance Determinations, 365 I.C.C. at 133. The ALJ found that neither trucks nor pipelines provide effective competition for the transportation of fuel oil in this case. The Review Board reversed the ALJ, concluding that Salt River needs rail service only for emergency shipments of fuel oil. Even in such situations, the Review Board found, Salt River has used higher cost trucks instead of Southern Pacific to transport fuel oil from the Southern Pacific origins to the Kyrene and Santan plants. From that finding the Review Board apparently inferred that "transportation costs do not appear to be of primary importance," because if they were, Salt River would not use trucks. J.A. at 176. Therefore, it concluded, trucks provide effective competition for the emergency transportation of fuel oil. Id.
 
 
 21
 The existence of motor carrier alternatives can be taken for granted in determining whether a railroad faces intermodal competition. 365 I.C.C. at 133. The pertinent inquiry is whether trucks are a feasible transportation alternative. Id. Salt River submitted evidence of the type called for in Market Dominance Determinations showing that trucks are never used when rail transportation is available. The evidence further showed that contrary to the Review Board's finding, trucks have never been used to transport fuel oil from any of the Southern Pacific origins to either Kyrene or Santan. Moreover, Salt River submitted evidence showing that truck transportation is less convenient and much more costly.
 
 
 22
 The Review Board ignored that unrebutted evidence and relied exclusively upon the erroneous finding that Salt River has actually used trucks instead of Southern Pacific to transport fuel oil from the Southern Pacific origins to Kyrene and Santan. The Review Board's primary factual finding is therefore contrary to the evidence. More importantly, though it is not essential to a finding of intermodal competition that trucks actually have been used in lieu of the challenged carrier, see 365 I.C.C. at 131, as we noted above, there must be record evidence consistent with the ICC's guidelines showing that trucks nevertheless provide a feasible alternative. No such evidence is present in this record. The Review Board's conclusion that intermodal competition exists is therefore unsupported by the record and arbitrary and capricious.[8]
 
 3. Product Competition
 
 23
 "Product competition occurs when a receiver or shipper can use a substitute(s) for the product covered by the rail rate." 365 I.C.C. at 128. The ICC included product competition in Market Dominance Determinations on the premise that if a railroad wants the traffic, it must compete with the carrier transporting the substitute product. Id. The ALJ found that product competition is ineffective in this case because the "use of natural gas cannot be sustained on a permanent basis." J.A. at 159.
 
 
 24
 The Review Board reversed the ALJ's finding. The Review Board noted that both Kyrene and Santan can burn either natural gas or fuel oils, and it included a table showing that Salt River's use of fuel oils at the two plants has decreased dramatically in recent years. In 1979, 100% of the electricity generated at Santan, and 18% of the electricity generated at Kyrene was generated through the use of fuel oils; in 1981, those proportions had dwindled to 18% and 1%, respectively. J.A. at 175. The Board further noted that Salt River has had a supply contract with the El Paso Natural Gas Company for a number of years. Salt River has increased its use of natural gas because of the greater availability of the product since 1978, and because it is much cheaper than fuel oil. Finally, the Board found that Salt River has achieved significant savings by substituting natural gas for fuel oil and that it expects to continue to achieve such savings in the future. J.A. at 175. Based on these considerations, the Review Board concluded that the "record is quite persuasive that product competition presently exists." J.A. at 177.
 
 
 25
 Market Dominance Determinations states that evidence of product competition should show that the shipper or receiver can obtain feasible substitutes "without substantially greater cost, transportation or otherwise." 365 I.C.C. at 134. To demonstrate the existence of such a feasible substitute, the guidelines call for evidence of the use of the substitute product, its price, efficiency, and transportation costs. The evidence submitted by both Salt River and Southern Pacific clearly demonstrated that Salt River can and does use natural gas at substantially lower cost--product and transportation--than fuel oil, and that it expects to continue to do so in the future. The Review Board's findings on product competition are therefore adequately supported by the record.
 
 
 26
 We find unpersuasive Salt River's insistence that unless products are always contemporaneously available at competitive prices, they are not substitutable. Salt River in essence argues that natural gas is not and cannot be a substitute for fuel oil. See Brief for Petitioner at 48 ("Fuels are not equivalent and they are not commercially interchangeable."). This argument perhaps would be more persuasive if the record showed that Salt River has some fixed need for fuel oils that cannot be met by natural gas. In Arizona Public Service Co., for example, the evidence showed that the utility operates five plants that depend solely on oil and that it must use distillate fuel oil in its coal burning plants to ignite the coal and stabilize the temperatures at which it is burned. 742 F.2d at 646. Because the Review Board in that case "entirely disregarded [these facts] on the basis of pure administrative fiat," id. at 653, we rejected its findings on product competition.
 
 
 27
 In contrast, Salt River has no fixed need for fuel oils at either Kyrene or Santan. Assuming adequate supplies of natural gas were available, Salt River could operate both plants without fuel oils. We realize, of course, that in reality Salt River may face situations in which it must burn oil. We further accept Salt River's argument that on those occasions natural gas is not a feasible substitute for oil.[9] Salt River's own statements and argument indicate, however, that those situations are likely to occur irregularly and be short term. By focusing on those exceptional situations, Salt River's argument betrays a misunderstanding of the shipper-protective provisions of the Staggers Act. We find nothing in the Act or its legislative history to suggest that Congress intended to guarantee shippers, "at any given time," Brief for Petitioner at 45, a number of equally attractive transportation alternatives. Rather, Congress intended to "protect[ ] shippers who are truly subject to the market power of [a] railroad[ ].... [because] they have no transportation alternative." H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34, 38-39, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 3979, 3983-84 (emphasis added). Consistent with that intent, the evidence called for in Market Dominance Determinations is designed to "allow truly captive shippers every opportunity to demonstrate their status." 365 I.C.C. at 120 (emphasis added).
 
 
 28
 Salt River simply is not such a shipper, even though it may at times be unable to obtain sufficient natural gas to meet its needs at Kyrene and Santan. Even in those situations the record shows that Salt River obtains fuel oil almost exclusively from sources other than those served by Southern Pacific. We therefore will not reverse the Review Board for declining to focus on those short term situations in which Salt River may depend on Southern Pacific.[10] We do not believe Congress, in formulating the market dominance inquiry, had in mind situations such as the present in which a particular railroad arguably may have transitory market power. Cf. 2 P. Areeda, D. Turner, Antitrust Law p 505 (1978) ("The significance of market power depends not only on its degree but also on its durability. Just as the degree of market power may be too trivial to warrant concern, so may it be too transitory.").
 
 4. Geographic Competition
 
 29
 Geographic competition is competition resulting "from a shipper's or receiver's ability to get the product to which the rate applies from another source, or ship it to another destination." Market Dominance Determinations, 365 I.C.C. at 128. The ALJ found that geographic competition is ineffective because "although other sources of residual fuel oil have been found to meet specifications of the plants, transportation rates and distance make purchases from these sources uneconomical." J.A. at 159.
 
 
 30
 The Review Board reversed the ALJ. The Board found that while Salt River has not received any fuel oil from the Southern Pacific origins in recent years, it has received varying amounts from other origins, depending upon the production schedules at the Kyrene and Santan plants. The Board noted that Salt River's primary alternative source has been Watson, California, from which distillate fuel oil is transported via SPPL to tank farms in Phoenix and then trucked to Kyrene and Santan. The Board further noted that Salt River has received fuel oil via trucks from various origins in New Mexico, Texas, and California. The Review Board then concluded that even though there have been fluctuations in volume, Southern Pacific faces geographic competition for the fuel oil market at the Kyrene and Santan plants. J.A. at 174, 176-77.
 
 
 31
 Salt River does not contest the Review Board's findings that it has received more fuel oil from alternative origins than from the Southern Pacific origins. Salt River concedes that it has received distillate fuel oil from seven other sources, and residual fuel oil from eleven others. In 1979, the last high burn year, Salt River received 10,000-11,000 tons of distillate fuel oil from the Southern Pacific origins. J.A. at 92. In contrast, it received more than five times that amount, approximately 57,000 tons, from other refineries. Moreover, more than half of the distillate received from alternative origins was transported via SPPL-truck, at transportation costs considerably lower than those by rail. J.A. at 60, 96. With respect to residual fuel oil, Salt River received approximately 11,500 tons from the Southern Pacific origins and approximately 2,000 tons by truck from other origins. J.A. at 52, 92, 97.
 
 
 32
 In 1980, Salt River received no fuel oil from the Southern Pacific origins compared to approximately 9,500 tons of distillate via SPPL-truck and 336 tons of residual via motor carriers. J.A. at 92, 96, 98. Again in 1981, Salt River received no fuel oil from the Southern Pacific origins. J.A. at 92. The record is unclear whether it received any oil from other origins; Salt River's records show that it received no oil that year while SPPL's records show that it transported to Salt River approximately 3,700 tons of distillate from Watson. J.A. at 110.
 
 
 33
 In Arizona Public Service Co., we rejected as "pure speculation" the Review Board's finding of geographic competition. 742 F.2d at 654. In that case, the record showed that the complainant principally relied on oil from the challenged origins, but the Review Board attempted "to construct an entirely hypothetical argument that geographic competition nonetheless exist[ed]" based on the complainant's past use of small amounts of oil from other sources. Id. In contrast, the Review Board in the present case did not base its finding on speculation or hypothesis. Rather, its finding is based on record evidence showing that Salt River not only has alternative geographic sources available to it for the supply of its fuel oil, but that it in fact relies almost exclusively on those alternative sources.[11]
 
 
 34
 Despite its demonstrated "ability to get the product to which the rate applies from [other] source[s]," 365 I.C.C. at 128, Salt River contends that geographic competition is not effective because it cannot rely on other refineries to put pressure on Southern Pacific's rates.[12] Briefly stated, Salt River argues that under certain conditions, it has no alternative but to obtain fuel oil from the Southern Pacific origins, that Southern Pacific knows this, and that Southern Pacific therefore has no incentive to lower its rates nor is it restrained from raising them if it so chooses.
 
 
 35
 The Review Board rejected Salt River's argument. The Board accepted Salt River's proposition that at times it must rely on the Southern Pacific origins, characterizing those situations as a need for "emergency [rail] shipments." J.A. at 177. The Board also did not dispute Salt River's contention that Southern Pacific's rates have not responded to the availability of alternative origins. The Review Board focused, however, on the "continuing movement of fuel oil from other origins to [Kyrene and Santan]," to conclude that "a finding of geographic competition for this fuel oil market is warranted." Id.
 
 
 36
 While we " 'may not supply a reasoned basis for the agency's action that the agency itself has not given' ..., [w]e will ... 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (citations omitted). The Review Board's reasoning here, though regrettably terse, is sufficient to pass muster under our deferential standard of review.
 
 
 37
 Whether it is characterized as "emergency," as the Review Board described it, or as "irregular," as Salt River describes it, J.A. at 12, 134, Salt River's need for fuel oils from the Southern Pacific origins is clearly the exception. The Review Board thus found inapposite Salt River's arguments that it must at times rely on the Southern Pacific origins and that Southern Pacific's rates have not responded to geographic competition. The Board evidently concluded that because Southern Pacific enters the market only under exceptional and unpredictable circumstances, there is "little if any merit" in asking what effect the market has on its rates. J.A. at 177. Therefore, the Board chose to focus on the record evidence showing that when it needs fuel oils, Salt River relies primarily on alternative origins.
 
 
 38
 Given the record in this case, the Review Board did not act arbitrarily and capriciously in refusing to focus on Southern Pacific's pricing behavior to determine whether it is market dominant. The evidence called for in Market Dominance Determinations focuses not on the railroad's pricing behavior, as Salt River would have it, but on the number of alternatives available to a complaining shipper, and the feasibility of using each of those alternatives.[13] See 365 I.C.C. at 131. This focus is consistent with the premise, adopted by Congress in the Staggers Act, that if a shipper has feasible alternatives, "then competition is present. Competition will serve to hold down rates, and the railroad involved [will] not have market power." See H.R.Rep. No. 1035, 96th Cong., 2d Sess. 34, 39, reprinted in 1980 U.S.Code Cong. & Ad.News 3978, 3979, 3984. That premise arguably is not valid in this case--that is, the availability of feasible alternatives ostensibly has not affected Southern Pacific's rates. This does not ineluctably mean, however, that Southern Pacific is market dominant. Although Salt River's alternatives may not exert effective market pressure on Southern Pacific's rates, they have effectively prevented Salt River from being a captive shipper.[14] Indeed, Southern Pacific has been all but shut out of Salt River's fuel transportation market. As we discussed with respect to product competition, we realize that there may be short term and exceptional situations in which none of Salt River's alternatives will be available, and Southern Pacific will arguably possess transitory market power. The Review Board's refusal to focus on those situations in this case is not inconsistent with either the Staggers Act or Market Dominance Determinations. We therefore affirm the ICC's findings on geographic competition.
 
 III. CONCLUSION
 
 39
 In challenging the reasonableness of Southern Pacific's rates, Salt River had the burden of first demonstrating that the railroad is market dominant. The ICC concluded that Salt River failed to make that showing because Southern Pacific faces intramodal, intermodal, product, and geographic competition. We hold that the ICC's findings on intramodal and intermodal competition are not the product of reasoned decisionmaking because the ICC failed to consider the evidence in a manner consistent with the guidelines set forth in Market Dominance Determinations. We also hold, however, that on the record in this case, the ICC's findings on product and geographic competition are consistent with Market Dominance Determinations and congressional intent in formulating the market dominance inquiry. We therefore uphold the ICC's determination that Southern Pacific is not market dominant.
 
 
 40
 So ordered.
 
 WALD, Circuit Judge, concurring:
 
 41
 I join Judge Tamm's opinion, and write separately only to underscore my view that in this case we go to the absolute limits of our ability to uphold an agency's result, despite error in its subsidiary findings. Normally, where fully one-half the factors relied upon by the agency rest on erroneous findings and the agency has not stated that its correct findings would, considered alone, have led to the same result, remand is unquestionably required. Only the weakness of the underlying evidence of market dominance in this case, as ably discussed by Judge Tamm, leads me to agree that the agency would indeed have found no market dominance had it correctly analyzed the facts.
 
 
 
 [1]
 Salt River receives all of its natural gas by pipeline from El Paso, Texas, under a supply contract with the El Paso Natural Gas Company. Joint Appendix (J.A.) at 174-75
 
 
 [2]
 Under 49 C.F.R. Sec. 1115.2(b), appeals from initial decisions must be based on one or more of the following grounds:
 (1) That a necessary finding of fact is omitted, erroneous, or unsupported by substantial evidence of record;
 (2) That a necessary legal conclusion, or finding is contrary to law, Commission precedent, or policy;
 (3) That an important question of law, policy, or discretion is involved which is without governing precedent;
 (4) That prejudicial procedural error has occurred.
 
 
 [3]
 5 U.S.C. Sec. 706 provides in relevant part that a reviewing court shall--
 (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
 * * *
 (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.
 5 U.S.C. Sec. 706 (1982).
 
 
 [4]
 In Arizona Public Service Co., we did not discuss the ambiguities involved in determining that the "substantial evidence" test applies. We discussed those ambiguities in footnote 39 of Farmers Union Central Exchange, Inc. v. FERC, 734 F.2d 1486, 1499 n. 39 (D.C.Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984), and will not recount them here. We add only the obvious: by applying the "substantial evidence" test, we reject language in footnote 5 of Asphalt Roofing Mfrs. Ass'n v. ICC, 567 F.2d 994, 1002 n. 5 (D.C.Cir.1977) (per curiam), suggesting that only the "arbitrary and capricious" test applies
 
 
 [5]
 A number of our recent cases have set forth the statutory scheme governing the ICC's jurisdiction over railroad rates. See Coal Exporters Ass'n v. United States, 745 F.2d 76, 80 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985); Arizona Public Service Co. v. United States, 742 F.2d 644, 647 (D.C.Cir.1984); Arkansas Power & Light Co. v. ICC, 725 F.2d 716, 718 (D.C.Cir.1984); Ford Motor Co. v. ICC, 714 F.2d 1157, 1158 (D.C.Cir.1983). Briefly summarized, until 1976 rail users could challenge a rate at any time and the Commission had general jurisdiction to determine whether the rate was just and reasonable. Congress significantly limited the ICC's rate jurisdiction in the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (4-R Act), by confining it to cases in which the carrier had market dominance over the traffic involved. 49 U.S.C. Sec. 1(5)(b) (1976)
 The ICC gave an expansive interpretation to the term "market dominance" and as a consequence continued extensively to control rail rates. In response, Congress further deregulated the railroad industry with the passage of the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (codified at 49 U.S.C. Secs. 10101a(1) et seq.). The Staggers Act retains the "market dominance" requirement and adds a threshold requirement that the challenged rate must result in revenues exceeding a specified percentage of the variable costs of providing the service. 49 U.S.C. Sec. 10709(d)(2). When a rate is challenged as unreasonable, the carrier has the burden of proving that the rate is below this jurisdictional threshold; if successful, the lack of market dominance is conclusively established and the ICC has no jurisdiction. If the rate is above the specified ratio, the ICC must still determine that the carrier is market dominant before it has jurisdiction to determine the reasonableness of the rates.
 
 
 [6]
 The Fifth Circuit approved Market Dominance Determinations in 1983. Western Coal Traffic League v. United States, 719 F.2d 772 (5th Cir.1983) (en banc), cert. denied, --- U.S. ----, 104 S.Ct. 2160, 80 L.Ed.2d 545 (1984)
 
 
 [7]
 There was also evidence of an alternative joint-line Southern Pacific-Santa Fe route. The Review Board did not consider that option as a competitive alternative
 
 
 [8]
 We note here our frustration with the ICC's failure to consider properly its own guidelines on intramodal and intermodal competition. With respect to intermodal competition, it did no more than seize on the fact that Santa Fe happens to serve the same origins to construct a hypothetical argument that it could compete with Southern Pacific. With respect to intermodal competition, the Review Board's erroneous factual finding that trucks have been used to transport fuel oil from the Southern Pacific origins may explain, though not justify, its determination. Even after Salt River pointed out that error, however, the ICC persists in arguing that trucks constitute effective competition. In fact, in its Supplemental Brief discussing Arizona Public Service Co. and at oral argument, the ICC argued that intermodal competition constitutes the most significant basis for determining that Southern Pacific lacks market dominance. See Supplemental Brief for Respondent at 2. It makes this assertion notwithstanding the fact that all of the record evidence, considered in accordance with Market Dominance Determinations, points to a lack of effective intermodal competition
 The ICC's approach not only unnecessarily casts a pallor of doubt over the rest of its determinations and supporting arguments, it also raises another concern. Under the Chenery doctrine, "[w]hen an administrative decision is based on inadequate or improper grounds, a reviewing court may not presume that the [agency] would have made the decision on other, valid grounds." American Public Transit Ass'n v. Lewis, 655 F.2d 1272, 1278 (D.C.Cir.1981). See SEC v. Chenery Corp. (II), 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); SEC v. Chenery Corp. (I), 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). This rule prevents a court from improperly substituting its judgment and evaluation for that of the responsible agency. American Public Transit Ass'n, 655 F.2d at 1278, 1279.
 Upon consideration, we conclude that we may uphold, without running afoul of the doctrine, the ICC's ultimate determination that Southern Pacific lacks market dominance though it is based in part on erroneous findings of intramodal and, particularly, intermodal competition. When an agency relies on a number of findings, one or more of which are erroneous, we must reverse and remand only when there is a significant chance that but for the errors the agency might have reached a different result. When it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming. See generally Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 DUKE L.J. 199. In the present case, because it is clear that the ICC would conclude that Southern Pacific lacks market dominance based on its findings on product and geographic competition, we may uphold its determination.
 We nevertheless implore the ICC to apply more diligently its own rules. We are aware of the large number of Staggers Act complaints the ICC faces, and we are not insensitive to the pressures a heavy caseload can cause. See Ford Motor Co. v. ICC, 714 F.2d 1157, 1171 (D.C.Cir.1983). We must insist, however, that the ICC administer its responsibilities fairly and engage in reasoned decisionmaking in acting on those complaints.
 
 
 [9]
 See Arizona Public Service Co., 742 F.2d at 653 ("[P]etitioner burns oil only when it must--that is, when natural gas is for some reason unavailable to meet petitioner's needs. In these situations natural gas cannot be considered a substitute for oil....")
 
 
 [10]
 In Arizona Public Service Co., we concluded that evidence of product competition was inconclusive and therefore entitled to minimal consideration by the Review Board. 742 F.2d at 653. For the reasons explained in the text, we hold that based on the record in this case the Review Board's finding that natural gas is a feasible substitute for fuel oil is not arbitrary and capricious
 
 
 [11]
 The lack of current movements over the Southern Pacific routes is not in itself indicative of a lack of market power. As Salt River correctly points out, though it was forced by section 229 of the Staggers Act to file its complaint in March 1981, the market conditions prevailing at that time are not necessarily typical of Salt River's fuel transportation market. On the other hand, we are unable to find reliable record evidence suggesting that Southern Pacific will ever participate in that market on anything other than an irregular and short-term basis. It is the absence of that type of evidence and not the lack of current movements that prevents Salt River from showing that Southern Pacific is market dominant
 
 
 [12]
 Salt River also argues that the Review Board erred in considering shipments from Watson via SPPL as evidence of geographic competition because SPPL is not a competitor, but a corporate affiliate of Southern Pacific. Because there is no evidence suggesting that their affiliation has in any way affected rates, traffic volumes, or any other component of the relevant fuel transportation market, however, we reject Salt River's argument
 
 
 [13]
 To be sure, important among the factors in determining whether a particular alternative is feasible is its relative cost--that is, the cost of the alternative versus the cost of the railroad
 
 
 [14]
 For this reason, we also reject Salt River's argument that the Review Board erred by failing to consider the allegedly high level of Southern Pacific's rates as evidence of market power. Salt River contends that an examination of the revenue-to-variable cost ratios demonstrates that the rates yield monopoly profits. Because the Review Board found, based on Market Dominance Determinations, that Southern Pacific is not market dominant, it did not consider the reasonableness of the rates
 In Market Dominance Determinations, the ICC specifically abandoned its prior focus on revenue-to-variable cost ratios in market dominance inquiries. Under its prior rules, rates exceeding a ratio of 160% created a rebuttable presumption of market dominance. See 365 I.C.C. at 122. The ICC abandoned that approach in part because it was at odds with the rate threshold created by section 10701a of the Staggers Act, but more importantly because the ICC concluded that such evidence is not a reliable indicator of market dominance. The Commission explained that while "[p]rice cost ratios do provide a convenient benchmark for deciding whether to look for market dominance.... [they do not] tell us about the degree of market power possessed by the railroad, since they do not tell us whether a proposed rate will actually move traffic over an extended period of time." Id. Like the other rebuttable presumptions under the old rules, the rate focus "placed too much emphasis on quantitative evidence which did not fully reflect the circumstances of any given movement." Id. at 120.
 The present case would appear to be precisely the kind of situation the Commission was concerned about. The record indicates that Southern Pacific transports fuel oil for Salt River only in exceptional and short term situations. Under these circumstances, the level of Southern Pacific's rates is not a reliable indicator of whether it dominates the relevant market. The Review Board's failure to consider the reasonableness of the rates as evidence of market power therefore does not constitute arbitrary and capricious decisionmaking.