FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

May 12, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

DANA ALIX ZZYYM,

     Plaintiff - Appellee,

v.

MICHAEL R. POMPEO in his
official capacity as the Secretary
of State; STEVEN J. MULLEN, in
his official capacity as the
Director of the Colorado Passport
Agency for the United States
Department of State,

     Defendants - Appellants.

No. 18-1453

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:15-CV-02362-RBJ)**
_____

Paul D. Castillo, Lambda Legal Defense and Education Fund, Inc., Dallas,
Texas (Puneet Cheema, Lambda Legal Defense and Education Fund, Inc.,
Washington, DC; Emily E. Chow and Rory F. Collins, Faegre Baker
Daniels LLP, Minneapolis, Minnesota; and Ann E. Prouty, Faegre Baker
Daniels LLP, Denver, Colorado, with him on the briefs) on behalf of the
Plaintiff-Appellee.

Jennifer B. Dickey, Deputy Associate Attorney General, United States
Department of Justice, Washington, D.C. (Joseph H. Hunt, Assistant
Attorney General; Jason R. Dunn, United States Attorney; Hashim M.
Mooppan, Deputy Assistant Attorney General; Brinton Lucas, Counsel to
the Assistant Attorney General; Mark B. Stern and Lewis S. Yelin,

Attorneys, Appellate Staff, United States Department of Justice, on the briefs) for the Defendants-Appellants.

_____

Before **BACHARACH**, **SEYMOUR**, and **McHUGH**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

United States citizens ordinarily need a passport to leave or reenter the country. 8 U.S.C. § 1185(b). The passport serves a dual function, proving both identity and allegiance to the United States. *Haig v. Agee*, 453 U.S. 280, 293 (1981).

For decades, the State Department has identified applicants based on characteristics like an individual's sex. In identifying an applicant's sex, the State Department has taken a binary approach, considering everyone as either male or female.

This approach has thwarted Dana Zzyym's ability to get a passport. Zzyym applied for a U.S. passport, but was intersex and could not accurately identify as either male or female. Because neither option applied, Zzyym requested a passport with an "X" designation for the sex. The State Department refused and denied Zzyym's application. Zzyym sued, alleging that reliance on the binary sex policy

- exceeded the State Department's statutory authority,

- was arbitrary and capricious under the Administrative Procedure Act, and

2

- violated the U.S. Constitution.

The district court concluded as a matter of law that the State

Department had violated the Administrative Procedure Act because

- adherence to the binary sex policy exceeded the State Department's statutory authority and

- application of the policy to Zzyym was arbitrary and capricious.

The court thus did not reach Zzyym's constitutional claims.

We conclude that the State Department acted within its authority but exercised this authority in an arbitrary and capricious manner. The State Department gave five reasons for denying Zzyym's request for a passport. Two of the reasons were supported by the administrative record, but three others weren't. Given the State Department's partial reliance on three unsupported reasons, we don't know whether the State Department would have denied Zzyym's request if limited to the two supported reasons. The district court thus should have remanded to the State Department to reconsider the policy based only on the two reasons supported by the record.

## I. Dana Zzyym, an intersex person, applies for a passport.

The State Department defines an intersex individual as "someone 'born with reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female.'" Appellants' Opening Br. at 4–5 (quoting Appellants' App'x vol. 1, at 94). This definition fits

3

Zzyym, who was born with both male and female genitalia. Given the presence of genitalia for both sexes, Zzyym's birth certificate was initially left blank for the sex designation. But Zzyym's parents decided to raise Zzyym as a male, so the original birth certificate's blank for sex was filled in as "male." The State Department has treated this birth certificate as the original.

Zzyym lived as a male until adulthood. As an adult, Zzyym explored living as a woman and obtained a driver's license identifying as female. But Zzyym grew increasingly uncomfortable living as a woman and eventually identified as a nonbinary intersex person. While identifying as intersex, Zzyym obtained an amended birth certificate identifying the sex as "UnKnown."

When applying for a passport, Zzyym understood the need for accuracy. So rather than check the box for male or female, Zzyym wrote "intersex." To support the identification as intersex, Zzyym supplied

- a letter requesting an "X" sex designation and

- a letter from a physician stating that Zzyym is intersex.

Zzyym also provided the State Department with the amended birth certificate identifying the sex as "UnKnown" and a Colorado driver's license identifying the sex as female.[1]

---

[1] After applying for an intersex passport, Zzyym obtained a driver's license identifying the sex as "X."

4

**II.    The State Department denies Zzyym's passport application.**

The State Department denied Zzyym's request to designate the sex as "X," explaining that every applicant needed to check the box for either male or female. The State Department offered Zzyym three options:

1.    Zzyym could obtain a passport identifying the sex as female, consistent with the driver's license.

2.    Zzyym could obtain a passport identifying the sex as male if a physician attested that Zzyym had transitioned to become a male.

3.    Zzyym could withdraw the application.

Zzyym declined these options and requested reconsideration, providing two more physicians' letters stating that Zzyym is intersex. The State Department declined to reconsider and again denied Zzyym's application based on the binary consideration of everyone as either male or female.

**III.    Zzyym sues the State Department.**

Zzyym sued and the district court ordered a remand, concluding that the State Department's denial of Zzyym's application was arbitrary and capricious. On remand, the State Department decided to retain its policy and again denied Zzyym's application for a passport with an "X" sex designation. The district court again concluded that the State Department

5

had violated the Administrative Procedure Act, and the government appeals.

## IV. The State Department acted within its statutory authority.

The district court concluded that the State Department had exceeded its statutory authority by enforcing its binary sex policy against Zzyym. The government disputes this conclusion, and Zzyym presents two arguments in rebuttal:

1. The government waived this issue by omitting it from the opening appellate brief.

2. The State Department lacked statutory authority to deny a passport application based on a refusal to check either the "male" or "female" box.

We conclude that (1) the government did not waive this issue and (2) the State Department had statutory authority to require applicants to identify their sex as male or female.

### A. Standard of Review

We conduct de novo review of the district court's determination of the State Department's statutory authority. *EnergySolutions, LLC v. Utah*, 625 F.3d 1261, 1271 (10th Cir. 2010). If the State Department lacked statutory authority, its decision must be set aside. 5 U.S.C. § 706(2)(C).

### B. The State Department did not waive this argument.

In its opening appellate brief, the government focused largely on whether the State Department had acted arbitrarily and capriciously by

6

relying on the binary sex policy. But the government's opening appellate brief also addressed the issue of statutory authority, arguing that reversal of the characterization as arbitrary and capricious would compel us to reverse the ruling on statutory authority. The government reasoned that "the court's statutory-authority holding [was] entirely parasitic on its arbitrary-and-capricious ruling and therefore fail[ed] for the same reasons." Appellants' Opening Br. at 29.

Zzyym characterizes this reasoning as perfunctory, emphasizing that the government did not identify an issue involving statutory authority or address the issue elsewhere in its brief. According to Zzyym, the government's perfunctory reasoning constituted a waiver of any challenge to the State Department's statutory authority. We disagree.

In our view, the government's opening appellate brief adequately addressed the issue of statutory authority. Though only one appellate issue was identified, the government argued that the State Department had good reason to deny Zzyym's passport application. The government apparently intended that analysis to address both of the district court's rulings.

This approach was reasonable because the district court had intertwined its rulings on Zzyym's arguments. *See Prieto v. Quarterman*, 456 F.3d 511, 517 (5th Cir. 2006) (stating that when procedural and substantive issues were "inextricably intertwined," the appellant did not

7

waive the procedural issue by briefing only the substantive issue). The district court concluded that

- the State Department's reasons had been arbitrary and capricious and

- the absence of good reasons meant that the State Department had exceeded its statutory authority.

*Zzyym v. Pompeo*, 341 F. Supp. 3d 1248, 1260 (D. Colo. 2018).

Both rulings rested on the State Department's failure to justify its reliance on the binary sex policy. *See id.* ("Because neither the Passport Act nor any other law authorizes the denial of a passport application without good reason, and adherence to a series of internal policies that do not contemplate the existence of intersex people is not good reason, the Department has acted in excess of its statutory jurisdiction."). We thus conclude that the government adequately briefed its challenge as to statutory authority. Given this conclusion, we reject Zzyym's allegation of waiver.

### C. The State Department had statutory authority to deny Zzyym's passport application based on the binary sex policy.

The Passport Act allows the Secretary of State to "grant and issue passports, and cause passports to be granted, issued, and verified in foreign countries . . . under such rules as the President shall designate and prescribe for and on behalf of the United States and no other person shall grant, issue, or verify such passports." 22 U.S.C. § 211a. In turn, the

8

President has delegated the authority to prescribe rules to the Secretary of State. Executive Order 11295, 31 Fed. Reg. 10,603 (Aug. 5, 1966). We must consider the scope of statutory authority delegated to the Secretary of State and the State Department.

The statutory language is permissive, authorizing the State Department to deny passports for reasons not listed in the Act. *Haig v. Agee*, 453 U.S. 280, 290 (1981). For example, the Act does not say whether the State Department can deny passports to applicants unwilling to state their birth dates or Social Security numbers. Despite the absence of an express statutory provision, few would question the State Department's authority to deny passports when applicants withhold their birth dates or Social Security numbers. *See* 22 C.F.R. § 51.20(b) (requiring applicants to answer all questions pertaining to eligibility for a passport).

The Passport Act is silent about the State Department's authority to deny a passport to applicants who do not identify as male or female. Given this silence, Zzyym disputes the State Department's statutory authority to deny a passport to an applicant unwilling to check the box for either male or female.

The Supreme Court has addressed other challenges to the State Department's authority to deny passports for reasons that are not listed in the Passport Act. In these cases, the Supreme Court has analyzed the State Department's statutory authority by considering past administrative

9

practice and congressional acquiescence. *See, e.g.*, *Kent v. Dulles*, 357 U.S. 116, 127–30 (1958); *Zemel v. Rusk*, 381 U.S. 1, 7–13 (1965); *Haig v. Agee*, 453 U.S. 280, 291–301 (1981).

The Supreme Court first relied on past administrative practice in *Kent v. Dulles*, 357 U.S. 116 (1958). There the government insisted that applicants disclaim membership in the Communist Party in order to qualify for passports. 357 U.S. at 117–20. When some applicants refused, the State Department declined to consider their applications. *Id.* at 119–20.

The Supreme Court held that the State Department had exceeded its statutory authority. *Id.* at 129–30. In reaching this holding, the Court observed that the State Department had previously denied passports based on citizenship, allegiance to the United States, or unlawful conduct. *Id.* at 127. By contrast, the State Department had inconsistently denied passports based on belief or association. *Id.* at 129–30. This inconsistency made it unlikely that Congress had acquiesced in denying passports based on an applicant's membership in the Communist Party. *Id.*

But when the State Department has consistently restricted passports, courts assume that Congress has acquiesced if it has not legislated on the subject. For example, in *Zemel v. Rusk*, the Supreme Court held that the State Department could refuse to validate passports for travel to Cuba. 381 U.S. 1, 3 (1965). The Court reasoned that the Passport Act's language was broad enough to permit restrictions on where the applicant could go,

10

emphasizing the State Department's history of restricting destinations. *Id.* at 8–12.

But the State Department must sometimes confront novel challenges. Without past opportunities to enforce a policy, the State Department's open assertion of authority implies congressional acquiescence. *Haig v. Agee*, 453 U.S. 280, 303 (1981).

The Supreme Court inferred such congressional acquiescence in *Haig v. Agee*, 453 U.S. 280 (1981). There the State Department revoked the passport of a former CIA officer who had exposed undercover CIA operatives while travelling abroad. 453 U.S. at 283–86. In the past, the State Department had rarely encountered the need to revoke a passport based on national security or foreign policy. *Id.* at 303. But the infrequency of previous challenges didn't matter; the Court reasoned that the State Department had "openly asserted" its power to revoke a passport for reasons involving national security and foreign policy and Congress had not stepped in. *Id.* at 303–06 (quoting *Zemel*, 381 U.S. at 9). The Court thus concluded that Congress had implicitly approved the State Department's exercise of statutory power. *Id.* at 306. So the Court upheld the State Department's revocation of the passport. *Id.*

*Agee*'s logic fits here. Prior to Zzyym's application, the State Department had never denied a passport based on an applicant's unwillingness to identify as male or female. But under *Agee*, the

11

infrequency of enforcement does not strip the State Department of statutory authority. In denying a passport to Zzyym, the State Department followed a binary sex policy that had been in place for roughly 39 years.

Zzyym argues that the passport application itself did not alert Congress to the State Department's policy. But the binary sex policy was hardly a secret, for the State Department had enacted regulations requiring every applicant to use particular forms and to answer all of the questions on those forms. 22 C.F.R. § 51.20(a)–(b). Congress could have said if it wanted to allow applicants to bypass certain questions. Given the longevity of the State Department's policy and Congress's apparent acquiescence, we conclude that the binary sex policy fell within the State Department's statutory authority.[2]

Despite Congress's apparent acquiescence, Zzyym contends that the State Department can deny passports only for the reasons identified in *Kent*, *Zemel*, and *Agee*: citizenship, allegiance, unlawful conduct, foreign policy, and national security. *See* pp. 9–11, above. We disagree. Though

---

[2]    The district court concluded that the State Department had exceeded its authority because federal law does not permit denial of a passport application "without good reason." *Zzyym v. Pompeo*, 341 F. Supp. 3d 1248, 1260 (D. Colo. 2018). We view the quality of the reasons as pertinent to Zzyym's claim that the State Department's reasoning was arbitrary and capricious. *See* Part V, below. The issue of statutory authority turns on past administrative practice and congressional acquiescence—not the quality of the State Department's reasoning. *See* pp. 9–10, above.

12

the Supreme Court has crystallized some lawful and unlawful justifications for denying a passport, these justifications are illustrative—not exhaustive. The Supreme Court addressed them only because they were at issue in the three cases. *See*, *e.g.*, *Kent*, 357 U.S. at 127–28 (focusing only on established reasons for denying a passport that are "material here"). The Supreme Court didn't suggest that these were the only reasons that could justify denial of a passport. We thus conclude that the State Department had statutory authority to deny a passport to Zzyym for failing to identify as a male or female.

## V. The State Department's reliance on its binary sex policy was arbitrary and capricious.

The resulting issue is whether this application of the binary sex policy was arbitrary and capricious based on the existing administrative record. *See* 5 U.S.C. § 706(2)(A) (arbitrary-and-capricious standard); *Copar Pumice Co. v. Tidwell*, 603 F.3d 780, 791 n.3 (10th Cir. 2010) (existing administrative record). For this inquiry, we presume that the policy was valid and place the burden of proof on Zzyym. *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1273 (10th Cir. 2013).

Our review is "narrow," and we are "not to substitute [our] judgment" for the State Department's. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Given the narrowness of our review, we will disturb the administrative action only if

13

the State Department relied on improper factors, disregarded an important aspect of the problem, provided an explanation that was implausible or inconsistent with the evidence, or failed to consider an appropriate alternative. *Id.* at 43, 51.

On appeal, the government defends its reasons for requiring Zzyym to identify as a male or female.

**A. Only two of the State Department's five reasons are supported by the administrative record.**

The State Department gave five reasons for relying on the binary sex policy:

1. The policy ensured the accuracy and reliability of U.S. passports.

2. The policy helped identify individuals ineligible for passports.

3. The policy helped make passport data useful for other agencies.

4. No medical consensus existed on how to determine whether someone was intersex.

5. Creating a third designation for sex ("X") was not feasible.

We conclude that the first, fourth, and fifth reasons lack record support, but the second and third reasons are supported.

**1. The State Department's first reason (that the binary sex policy ensured the accuracy and reliability of U.S. passports) lacks support in the record.**

The State Department justified the binary sex policy in part as a way to promote accuracy and reliability, reasoning that every U.S. jurisdiction

14

had identified all citizens as either male or female. For this justification, the State Department focused on how it determines eligibility for passports. This determination ordinarily requires the State Department to verify an applicant's identity through identification documents issued by other U.S. jurisdictions. So the State Department considered how those jurisdictions identify characteristics such as an individual's sex.

The State Department noted that many U.S. jurisdictions allow amendment of identification documents, but differ on when to allow an amendment. For example, if a male transitions to a female, different jurisdictions may vary in

- whether to allow amendment of a birth certificate to reflect the new sex and

- what evidence is required to obtain the amendment.

Given these differences, the State Department focuses only on original identification documents.[3]

We thus consider how U.S. jurisdictions have treated a citizen's sex in original identification documents. For this inquiry, we use May 2017 as the applicable time frame because that is when the State Department denied Zzyym's request. *See* p. 13, above.

---

[3] Zzyym has not challenged the State Department's policy of relying only on original identification documents when evaluating passport applications.

15

In May 2017, every U.S. jurisdiction used a binary sex policy in a citizen's original identification documents, always listing the sex as either male or female.[4] Given the prevalence of binary sex policies, the State Department reasoned that listing a sex other than male or female would hamper verification of an applicant's identity.

Zzyym argues that requiring consistency between inaccurate identification documents does not render them more accurate or reliable. We agree. And for intersex individuals like Zzyym, treating every applicant as male or female would necessarily create inaccuracies.

---

[4] Zzyym argues that the agency failed to consider recent efforts by some states to authorize amended documents recognizing a third sex, characterizing these efforts as a trend toward allowing a third sex designation. But the State Department did consider this development, acknowledging that by 2017 a handful of jurisdictions had "issued amended birth certificates in a third sex, and . . . a very few number of state courts [had] issued court orders recognizing a sex change to a sex other than male or female." Appellants' App'x vol. 1, at 84. Despite these developments, the State Department continued to rely on original documents and resist acceptance of amended documents.

Zzyym also points out that state policies have evolved since May 2017. For example, Zzyym says that

- twelve states and the District of Columbia now authorize sex designations other than "M" or "F" on identification documents and

- seven states allow a gender-neutral category on birth certificates.

But we cannot consider this information because we are limited to the administrative record as of May 2017. *See* p. 13, above.

16

The State Department acknowledges that some individuals are born neither male nor female. Forcing these individuals to pick a gender thus injects inaccuracy into the data. A chef might label a jar of salt a jar of sugar, but the label does not make the salt any sweeter. Nor does requiring intersex people to mark "male" or "female" on an application make the passport any more accurate.

But the State Department prizes accuracy. To promote accuracy, the State Department requires applicants to submit original birth certificates, 22 C.F.R. § 51.42, and establish identity with corroborating identification documents, 22 C.F.R. § 51.23. If the designated sex does not match the identification documents, the applicant must obtain medical certification by a licensed physician. 7 FAM § 1310(a) App. M; Appellants' App'x vol. 1, at 88.

Given these requirements, an intersex applicant like Zzyym could not accurately complete the passport application in May 2017. If the applicant was intersex, the original identification documents would not accurately identify the applicant's sex. So the State Department's reliance on original identification documents would prevent intersex applicants from accurately identifying their sex.

At oral argument, the State Department conceded that applications for intersex individuals like Zzyym would be less accurate under the binary sex policy. The State Department thus noted that it had offered to produce

17

a passport with an "F" (matching Zzyym's original Colorado driver's license) or an "M" (matching the original birth certificate). But when asked what an applicant like Zzyym should do to ensure the accuracy of the passport, counsel for the State Department acknowledged that (1) "it may be difficult when one is confronted with a form with limited options that may not track one's best answer to a question" and (2) applicants "have to choose what fits best, and that may not be the most accurate answer that they would like to provide, but it is the answer that is available." Oral Arg. at 7:39–8:25.

In many cases, however, the "best" available answer may not conform to the applicant's original identity documents. States issue most original identification documents; and when the State Department denied Zzyym's application, most state identification documents pigeonholed everyone as male or female even though some people are neither. So reliance on the original identification documents would sometimes create inaccurate information.

Zzyym's experience illustrates the inevitable inaccuracies of a binary sex policy. Zzyym had two original identification documents that would ordinarily establish the sex: The original birth certificate identified Zzyym as male, and the driver's license said female. With conflicting identification documents, the State Department instructed Zzyym to either identify as female or obtain a medical certification showing transition to

18

male. Appellants' App'x vol. 1, at 67–68. But this instruction didn't make sense because Zzyym hadn't transitioned from female to male, and Zzyym's original birth certificate said that Zzyym was male.

The State Department's policy effectively allowed Zzyym to obtain a passport by claiming to be either male or female. But the State Department's binary sex policy assumes that Zzyym must be one or the other. How could Zzyym be neither male nor female and accurately identify as either sex?

Given the State Department's willingness to allow Zzyym to identify as either male or female, the binary sex policy sunders the accuracy and reliability of information on Zzyym's passport application.

\* \* \*

The State Department lacks record support for its asserted interest in accuracy and reliability. The State Department mirrored how every U.S. jurisdiction was treating gender in May 2017, but these jurisdictions shoehorned everyone into a binary sex classification ill-suited for intersex applicants. The State Department thus relied on information that didn't accurately describe intersex applicants like Zzyym.

19

**2. The State Department's second reason (that the binary sex policy helped the State Department identify individuals ineligible for passports) is supported by the record.**

The State Department also explained that the binary sex policy helpfully matches how other federal agencies record someone's sex. This explanation is supported by the record.

The State Department denies passport applications for various reasons. *See* 22 C.F.R. §§ 51.60–51.62. To evaluate these applications, the State Department must gather a broad range of information from federal, state, and local authorities. For example, the State Department may need to collect information from other federal agencies to decide whether an applicant has defaulted on a federal loan (22 C.F.R. § 51.60(a)(1)), has committed a sex offense (22 C.F.R. § 51.60(g)), or has obtained a conviction for drug trafficking (22 C.F.R. § 51.61).

The State Department thus underscored two facts bearing on the need for consistency in data recorded by different federal agencies:

1. "Sex is one of the primary data points used by these agencies in recordkeeping . . . ." Appellants' App'x vol. 1, at 85; *see id.* at 45–46 ("Sex is a key component of the 'biometric identity' that the Department uses to verify the identity of the applicant and distinguish individuals.").

2. "[A]ll such agencies recognize only two sexes." *Id.* at 85.

In May 2017, the State Department's system required an applicant's data to match many other federal agencies. And every federal database identified each person as either male or female. So if the State Department

20

searched for Zzyym with an "X" designation for sex, the search would yield mismatches for the applicant's sex. To uncover the reason for the mismatches, an employee in the State Department would need to manually override the "X" designation of sex.

The State Department could thus rationally insist on identifying the applicant's sex in a way that matched other federal databases.[5] To minimize confusion, the State Department reasonably concluded that a binary sex policy could enhance the ability to verify identity.[6]

Of course, the State Department also searches state and local databases in order to assess eligibility for a passport. For example, federal

_____

[5] Zzyym contends that the State Department failed to consider the federal government's permission for foreign individuals to enter the United States with passports bearing an "X" designation for sex. But the State Department could reasonably distinguish between the difficulties in accepting a foreign passport and issuing a U.S. passport. Accepting a foreign passport may not implicate the depth of communication with other federal databases that is needed to ensure eligibility for a U.S. passport. And we must defer to an agency's "reasonable conclusions regarding 'technical or scientific matters within the agency's area of expertise.'" *Utah Envtl. Cong. v. Richmond*, 483 F.3d 1127, 1140 (10th Cir. 2007) (quoting *Utah Envtl. Cong. v. Dale Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006)).

[6] Zzyym argues that mismatches "may in fact aid" the State Department because "[a]ny mismatch is flagged—whether an M/F or X/M/F disparity—ensuring that the underlying application receives more scrutiny." Appellee's Resp. Br. at 34. But Zzyym cites no authority or evidence for this proposition. Without any authority or evidence, we decline to speculate on the possibility that more mismatches could aid the State Department.

21

law prohibits the issuance of passports to anyone owing more than $2,500 in back child support. 42 U.S.C. § 652(k); 22 C.F.R. § 51.60(a)(2). Child support is governed by state law and enforced by state and local agencies. Though some state agencies did accommodate a third sex designation in 2017, the State Department reasonably concluded that inaccuracies could still arise when contrasting an "X" sex designation with the more common methods of designating someone's sex.

Zzyym points out that the State Department could obtain useable information from other agencies despite differences in the ways that they identified an individual's sex. For example, if an applicant's sex didn't match a federal agency's records, the State Department could verify an applicant's social security number, date of birth, and name. But manually overriding the mismatches would require additional resources.

Zzyym also points out that the State Department was apparently willing to tolerate mismatches for transgender individuals. For these individuals, the State Department used a process allowing an applicant to identify a sex differing from the one on the driver's license or birth certificate. Zzyym questions why the State Department was willing to accept mismatches for transgender applicants but not intersex applicants.

This argument proves that the State Department could accommodate discrepancies—not that it had to do so. In adopting the transgender policy, the State Department needed to evaluate all pertinent factors. *Citizens to*

22

*Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). But we have little information on the mix of factors contributing to the State Department's policy for transgender applicants. For example, nothing in the record suggests whether the State Department considered the possibility of mismatches with state databases as a factor weighing against the transgender policy.

Regardless of what the pertinent factors were, we know that the State Department was ultimately willing to tolerate some mismatches between transgender applicants' passport applications and the original identification documents. But we don't know how the State Department weighed the inevitability of these mismatches. Given the absence of information on how the State Department weighed this factor for transgender applicants, we cannot speculate. So the State Department's apparent tolerance for mismatches among transgender applicants does not bear on the reasonableness of this factor for intersex applicants.

Transgender applicants aside, Zzyym points out that mismatches may emerge whenever the State Department and a particular state use different methods to identify an individual's sex. For example, Zzyym points to the instruction to identify as either male or female, which may or may not correspond to states' underlying databases. So under either approach, mismatches will arise.

But the State Department has reasonably tried to limit unnecessary mismatches. Under arbitrary-and-capricious review, the agency need not select a perfect solution—just a rational one. *See Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) ("An agency's actions need not be perfect; we may only set aside decisions that have no basis in fact, and not those with which we disagree."), *quoted with approval in Biodiversity Conservation All. v. Jiron*, 762 F.3d 1036, 1074 (10th Cir. 2014). Because the State Department could rationally try to reduce unnecessary mismatches, we conclude that the administrative record supports the State Department's second reason to rely on the binary sex policy.

3. **The State Department's third reason (that the binary sex policy helped make passport data useful for other agencies) is supported by the record.**

The State Department also reasoned that using a third sex designation could burden other state and federal agencies when they use the State Department's data. Again, the State Department noted that (1) most agencies' systems accommodate only two sexes and (2) allowing a third sex designation could complicate searches. These complications, the State Department reasoned, would burden other agencies that use passport data.

For example, the State Department pointed to law enforcement, which often uses passport data to identify victims and to locate criminal suspects.

Zzyym argues that the State Department's rationale lacks record support and relies on "sweeping assumptions about technical specifications of third-party computer systems." Appellee's Resp. Br. at 34. We disagree. The State Department could reasonably conclude that use of a third sex designation would impede at least some other systems that classify everyone as either male or female. We thus conclude that the administrative record supported the State Department's third reason to rely on the binary sex policy.

**4.     The State Department's fourth reason (that a lack of medical consensus existed on how to identify individuals as intersex) is unsupported by the record.**

The State Department also concluded that the medical community lacks a consensus on how to determine whether someone is intersex, rendering an "X" designation "unreliable as a component of identity." Appellants' App'x vol. 1, at 86. But this reasoning lacks support in the administrative record and does not apply to unquestionably intersex individuals like Zzyym.

According to the State Department, medical experts vary on whether to base intersexuality solely on somatic characteristics, self-identification as intersex, or both. But the State Department cites no scientific evidence of this disagreement about the medical definition of intersexuality.

25

In defending this rationale, the State Department cites pages 86 and 87 of its appendix. This page is simply an excerpt from the State Department's brief in district court. In that brief, the State Department failed to cite any evidentiary support for a disagreement in the medical community about the meaning of intersexuality.[7]

Indeed, the State Department's appellate brief defines intersexuality based on somatic characteristics, stating that an intersex person is "someone 'born with reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female.'" Appellants' Opening Br. at 4 (citing Appellants' App'x vol. 1, at 94). This definition appears consistent with the academic literature on intersexuality.[8]

---

[7]    In denying Zzyym's request, the State Department said that "[r]eview of recent expert declarations and medical literature confirms that there is no [] consensus at this time as to the definition of a third sex." Appellants' App'x vol. 1, at 86. But the State Department did not identify or submit any of these declarations or medical excerpts.

[8]    *See* Heino F.L. Meyer-Bahlburg, *Transsexualism ("Gender Identity Disorder") – A CNS-Limited Form of Intersexuality?*, in Hormonal and Genetic Basis of Sexual Differentiation Disorders and Hot Topics in Endocrinology 75, 75–77 (Maria I. New & Joe Leigh Simpson eds., 2010) (describing intersexuality as "somatic" and distinguishing gender identity disorder from intersexuality); I.A. Hughes et al., *Consensus Statement on Management of Intersex Disorders*, 91 Archives Disease Childhood 554, 554–56 (2006) (surveying fifty international experts in the field of intersex disorders and stating that criteria suggesting a disorder of sexual development include genital ambiguity or variations, a family history of disorders of sexual development, and chromosomal variations); John

26

In district court, the State Department pointed out that three physicians had given three different reasons for classifying Zzyym as intersex:

1. Zzyym "was born with ambiguous genitalia." Appellants' App'x vol. 1, at 59.

2. Zzyym "has had the appropriate clinical treatment for transition to intersex." *Id.* at 71.

3. Zzyym "was born intersex," "identifies as intersex," and "has had surgery for transition to female genitalia." *Id.* at 73.

These differences, the State Department argued, illustrated the lack of medical consensus about the meaning of intersexuality.

The State Department's argument in district court had overlooked the context for these differences. The first physician had classified Zzyym as intersex based solely on the basis of somatic characteristics, referring to

---

McLean Morris, *Intersexuality*, 163 J. Am. Med. Ass'n 538, 540 (1957) (stating that the term "intersexual" "should be restricted to those with congenital anatomic variations and not used when referring to those showing the endocrine phenomena of post-natal virilization or feminization"); U.S. National Library of Medicine, *Intersex*, MedlinePlus, https://medlineplus.gov/ency/article/001669.htm (updated Aug. 7, 2019) ("Intersex is a group of conditions where there is a discrepancy between the external genitals and the internal genitals (the testes and ovaries)."); *see also* Jessica A. Clarke, *They, Them, and Theirs*, 132 Harv. L. Rev. 894, 898 (2019) (stating that intersex individuals are "people who are born with any of a range of sex characteristics that may not fit a doctor's notions of binary 'male' or 'female' bodies" (quoting Intersex Definitions, Interact, https://interactadvocates.org/intersex-definitions/)); Aileen Kennedy, *Fixed at Birth: Medical and Legal Erasures of Intersex Variations*, 39 Univ. New S. Wales L.J. 813, 813 (2016) ("The term 'intersex' describes variations in sex development whereby a person's biological sex traits are not exclusively male or female." (footnote omitted)).

the presence of ambiguous genitalia. The State Department rejected this explanation and pointed Zzyym to the policy for transgender applicants, which required a physician's statement attesting to "appropriate clinical treatment for transition to the new gender." *Id.* at 68. In response, Zzyym supplied the second letter, which complied with the State Department's instruction to verify transition to the new gender. *Id.* at 71. The third letter simply confirmed that Zzyym was intersex and identified as intersex. *Id.* at 73. None of the letters purported to define intersexuality or discussed how the medical community defines intersexuality.

Even if the medical community disagreed on whether some individuals are intersex, the State Department would need to explain why the lack of a consensus would justify denying Zzyym's application. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (stating that administrative decisions must rationally connect the factual findings to the decision being made).

The State Department didn't provide such an explanation, assuming instead that disagreement about whether some applicants were intersex would prevent classification of anyone as intersex. Why? The State Department has never questioned whether Zzyym is intersex. Given Zzyym's undebatable intersexuality, the State Department failed to explain why a lack of consensus about other individuals would justify forcing intersex individuals like Zzyym to inaccurately identify themselves as male

28

or female. Without such an explanation, we conclude that the State Department lacked record support for its fourth reason to rely on a binary sex classification.[9]

**5. The State Department's fifth reason (that adding a third sex designation ("X") would be infeasible) lacks support in the record.**

Finally, the State Department reasoned that a third sex designation would be infeasible because of the required time and expense. But the

---

[9] Zzyym also argues that the State Department could have adopted the conclusions of the World Professional Association for Transgender Health (WPATH). After all, WPATH's conclusions had spurred the State Department to revise its policy for transgender passport applications.

WPATH's Standards of Care acknowledge intersexuality and suggest that countries offer a third sex option. Given these standards, Zzyym argues that the State Department should have (1) adhered to the WPATH Standards of Care or (2) explained its departure from those standards. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (holding that an agency must show an awareness that it is changing its policy and explain why).

In our view, the State Department was not required to use the WPATH standards for intersex individuals despite using these standards for transgender applicants. WPATH is a private nonprofit health organization that makes recommendations, not a public entity creating international standards for passports. And the State Department's Foreign Affairs Manual has not established WPATH standards as official government standards or required the government to defer to WPATH standards in future policymaking. The Foreign Affairs Manual states only that the government chose to use the WPATH standards for individuals transitioning from one sex to another. Adopting WPATH's recommendation for transgender individuals does not require adoption of the recommendation for intersex individuals.

29

State Department did not estimate the additional time or expense. The State

Department said only that it anticipated "considerable" challenges to

- alter various systems,

- update systems within the Bureau of Consular Affairs,

- update internal State Department systems, and

- update systems within other federal agencies that rely on passport data.

Appellants' App'x vol. 1, at 87.

After the district court granted judgment to Zzyym, the State

Department moved to stay the court's order. With this motion, the State

Department attached a declaration quantifying the time and expense to

alter the passport system. Appellants' App'x vol. 3, at 229. The declarant

- noted that standard U.S. passports are electronic and contain chips with a secure digitized image and biographic data,

- described many information technology systems that would require modification, and

- estimated that changing existing software systems would take 24 months and cost $11 million.

*Id.* at 225–26. We decline to consider these estimates because "review of

agency action 'generally focuses on the administrative record in existence

at the time of the agency's decision.'" *Copar Pumice Co. v. Tidwell*, 603

F.3d 780, 791 n.3 (10th Cir. 2010) (quoting *Forest Guardians v. U.S.*

*Forest Serv.*, 579 F.3d 1114, 1131 (10th Cir. 2009)); *see* p. 13, above.[10]

To justify the lack of an estimate, the State Department cites

*Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of*

*Engineers*, 702 F.3d 1156 (10th Cir. 2012). That opinion does not apply. In

*Hillsdale*, we held that the Army Corps had not needed to quantify the

effects of granting a permit on certain air emissions because those

emissions involved only a small fraction of the anticipated impact. 702

F.3d at 1175–76. Here the government's argument is different—that a

change would obviously increase cost.

To assess the government's allegation of an obvious increase in cost,

we must engage in a searching, careful inquiry. *City of Colorado Springs v.*

*Solis*, 589 F.3d 1121, 1131 (10th Cir. 2009). In doing so, we cannot accept

conclusory statements in lieu of a meaningful explanation. *See Zen*

---

[10]     The State Department also submitted a second declaration that
discussed consideration of a "one-off" passport. Appellants' App'x vol. 3,
at 227. This declarant acknowledged the possibility of incorporating "'one-
time' modifications to certain systems to change the sex marker in the
issuance system's database, to an 'X.'" *Id.* Despite this possibility, the
State Department ultimately decided not to produce a one-off passport
because it would undermine the validity of U.S. passports and compromise
national security and foreign policy objectives. *Id.* But the administrative
record contains no mention of concerns involving national security or
foreign policy, so we decline to consider this argument.

31

*Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1150 (10th Cir. 2016).

The expense is not obvious. Indeed, nine states (California, Colorado, Maine, Minnesota, Nevada, New Jersey, Oregon, Vermont, and Washington) insist that "adding non-binary gender designation in accord with national and international standards has required negligible administrative effort—the kind that accompanies routine changes to government documents." Br. of Amici Curiae States at 8. One of these states (Colorado) represents that it incurred no cost in adopting a third sex designation. *Id.* Given the conflicting information and the absence of any cost evidence in the administrative record, we do not regard the additional expense as obvious.

In the absence of any meaningful explanation, the State Department lacks record support for its reliance on additional time and expense.

**B.    The State Department did not fail to consider alternatives.**

Zzyym insists that the State Department had to consider the alternative of a third sex designation before deviating from international standards. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983). But the State Department did consider those standards, and reliance on the binary sex policy conformed to those standards.

The International Civil Aviation Organization (ICAO) sets standards to ensure that every country's passports are machine-readable. The State Department followed that policy, making every U.S. passport machine-readable.

In recognizing gender changes and intersex individuals, the ICAO noted that some countries might issue passports with an "unspecified" designation, using an "X" printed letter and a "<" machine-readable character. In explaining its decision to adhere to the binary sex policy, the State Department attached a document entitled "Use of a Third Sex Marker by Contracting States as Permitted by ICAO." Appellee's Supp. App'x at 56. The attachment of this document showed that the State Department had recognized the ICAO change.

The binary sex policy conforms to the ICAO standard. The ICAO allowed use of a third sex designation but did not require it. Appellants' App'x vol. 3, at 220 ("Since 1999, ICAO standards have allowed, but do not require, countries to permit a third sex designation: 'unspecified.'"). The State Department simply decided not to use the ICAO's option,[11]

---

[11]    Only a few countries use the ICAO's "X/<" option even though it has been standardized for roughly 20 years. *See* Appellants' App'x vol. 3, at 220 ("Although several countries have begun to offer a third option in their passports, most countries have not."); Appellee's Supp. App'x at 57 (listing Australia, Bangladesh, Denmark, India, Malta, Nepal, and New Zealand as the only countries issuing passports in 2017 with a third sex designation).

reasoning that it would not have matched how any U.S. jurisdiction was treating the designation of sex in original identification documents. The State Department thus considered the alternative of using a third sex designation.

**VI.  Given the existence of two reasons that are supported and three others that are unsupported, the State Department must reconsider its denial of Zzyym's application.**

We have concluded that (1) the State Department's first, fourth, and fifth reasons are unsupported and (2) the second and third reasons are supported. We have no way of knowing whether the State Department would still have relied on the binary sex policy if limited to the second and third reasons.

When an administrative decision rests on multiple grounds—some supported and some not—we must determine what the agency would have done had it recognized its errors. When an agency has indicated that its reasons were independent and one of the reasons was flawed, we have upheld the agency action. *Am. Fed'n of Gov't Emps. AFL-CIO, Local 2263 v. Fed. Labor Relations Auth.*, 454 F.3d 1101, 1107 (10th Cir. 2006). But we have never encountered a situation where we cannot tell whether the agency would have taken the same action if it had known that some justifications were unsupported.

Two circuits, the D.C. Circuit and the Fifth Circuit, have considered this issue. The D.C. Circuit has held that when an agency relies on

34

multiple grounds and some of the reasons are unsupported, the court can ordinarily uphold the administrative decision only if the agency clearly would have reached the same decision if limited to the supported reasons. *NLRB v. CNN Am., Inc.*, 865 F.3d 740, 756 (D.C. Cir. 2017); *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 939 (D.C. Cir. 2011); *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006). For this holding, the D.C. Circuit has reasoned that "[a]rbitrary and capricious review strictly prohibits us from upholding agency action based only on our best guess as to what reasoning truly motivated it." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 328–29 (D.C. Cir. 2006). So when the court cannot tell whether an agency's surviving rationale would have led to the same decision, the D.C. Circuit has remanded to the agency. *See, e.g.*, *Consol. Edison Co. of New York v. FERC*, 823 F.2d 630, 641 (D.C. Cir. 1987).

The Fifth Circuit took a different approach in *Texas Tech Physicians Ass'ns v. DHS*, 917 F.3d 837 (5th Cir. 2019). There the court said in a footnote:

> Typically, when an agency reaches a decision based on erroneous reasoning, the *Chenery* doctrine prohibits a reviewing court from upholding that decision for an alternative reason. But when an agency gives multiple reasons, we may uphold its decision based on any one of those reasons. *Salt River Project Agr. Imp. & Power Dist. v. United States*, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985).

35

*Id.* at 844 n.4 (citation omitted). In stating that the court could uphold the decision for any one of the agency's stated reasons, the court relied solely on a D.C. Circuit opinion: *Salt River Project Agricultural Improvement & Power District v. United States*, 762 F.2d 1053 (D.C. Cir. 1985). *See Texas Tech Physicians*, 917 F.3d at 844 n.4.

*Salt River* follows the D.C. Circuit's ordinary approach. Under this approach, the D.C. Circuit has ordinarily required remand when an agency gives multiple reasons for a decision and one or more of the reasons are invalid. *See* pp. 34–35, above. But the D.C. Circuit also recognizes that agencies sometimes make clear that they would have reached the same decision even without the invalid reasons. *Salt River*, 762 F.2d at 1060 n.8.

In *Salt River*, the D.C. Circuit confronted this situation when an agency had found that a railroad lacked market dominance after considering four types of competition: (1) intramodal, (2) intermodal, (3) product, and (4) geographic. *Id.* at 1059. The D.C. Circuit upheld the findings on product and geographic competition and invalidated the findings on intramodal and intermodal competition. *Id.* at 1059–65. The court noted that invalidation of some of the agency's reasons would ordinarily require remand because the court cannot "presume that the [agency] would have made the decision on other, valid grounds." *Id.* at 1060 n.8 (quoting *Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C. Cir. 1981)). But the court decided that it could uphold the agency's

ultimate result, reasoning that the administrative findings clearly showed

that the agency would have "conclude[d] that [the railroad] lack[ed] market

dominance based on its findings on product and geographic competition."

*Id.*[12]

>   We have not yet considered the need to remand when an agency

> - gives multiple reasons, some supported and others unsupported, and

> - doesn't indicate whether the agency would have reached the same result without relying on the unsupported reasons.

But both the Supreme Court and our court have addressed analogous issues.

In doing so, both courts have taken an approach resembling the D.C.

Circuit's. For example, we've reversed and remanded when a district court

erroneously submits a legal question to the jury and it's uncertain whether

---

[12]    One of the panel members explained the importance of clarity in the administrative findings:

>   I join [the majority] opinion, and write separately only to underscore my view that in this case we go to the absolute limits of our ability to uphold an agency's result, despite error in its subsidiary findings. Normally, where fully one-half the factors relied upon by the agency rest on erroneous findings and the agency has not stated that its correct findings would, considered alone, have led to the same result, remand is unquestionably required. Only the weakness of the underlying evidence of market dominance in this case, as ably discussed [in the majority opinion], leads me to agree that the agency would indeed have found no market dominance had it correctly analyzed the facts.

762 F.3d at 1065 (Wald, J., concurring).

37

the jury relied on an improper view of the law. *E.g.*, *Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc.*, 51 F.3d 910, 916–17 (10th Cir. 1995). The Supreme Court has done the same when a valid and invalid theory were submitted to the jury and the jury returned a general verdict, creating uncertainty on whether the jury relied on the invalid theory. *E.g.*, *Yates v. United States*, 354 U.S. 298, 311–12 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978); *Williams v. North Carolina*, 317 U.S. 287, 291–304 (1942); *Stromberg v. California*, 283 U.S. 359, 367–70 (1931). Requiring reversal in these circumstances, the Supreme Court and our court have reasoned that a general verdict cannot stand when the court must speculate on whether the factfinder would have reached the same determination without an error. *Yates*, 354 U.S. at 312; *Williams*, 317 U.S. at 292; *Stromberg*, 283 U.S. at 368; *United States v. Samora*, No. 19-4070, 954 F.3d 1286, slip op. at 13 (10th Cir. Apr. 8, 2020); *Dillard & Sons*, 51 F.3d at 916; *United States v. Dota*, 482 F.2d 1005, 1006 (10th Cir. 1973).

The same reasoning applies when we review administrative decisions. Here too we lack the power to "guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 197 (1947). If we can't determine whether the agency necessarily relied on deficient reasons, it would make little sense to uphold the agency's action. In these cases, remand is appropriate "since proceeding on the right path may require or at

38

least permit the agency to make qualifications and exceptions that the wrong one would not." Henry J. Friendly, Chenery *Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 223.

But a court can sometimes discern from the record whether the agency would have reached the same decision without relying on the unsupported reasons. *See, e.g.*, *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 718 (D.C. Cir. 2006) (denying a petition for review because the agency's decision shows that there is no reasonable dispute that the agency relied on an independent, valid reason rather than the invalid reason); *see also* pp. 36–37, above (discussing *Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053 (D.C. Cir. 1985)). For example, we can uphold administrative action when an agency gives two independent reasons and only one of them is valid. *Am. Fed'n of Gov't Emps. AFL-CIO, Local 2263 v. Fed. Labor Relations Auth.*, 454 F.3d 1101, 1105–07 (10th Cir. 2006); *accord Doe v. McAleenan*, 929 F.3d 478, 485 (7th Cir. 2019) ("[B]ecause [the agency's] determination was based on two independent and alternative grounds, we would have to find error in both determinations in order to grant relief to [the petitioner].").

Other administrative determinations are harder to parse. For example, in *Consolidated Edison Co. of New York v. FERC*, the D.C. Circuit

39

remanded after rejecting one of the agency's justifications. 823 F.2d 630, 641 (D.C. Cir. 1987). The court emphasized that the agency's error had not been "some minor misstatement of law or fact that [could] be passed over as an unfortunate lapse." *Id.* The error had reflected the agency's "pervasive frame of mind . . . about a crucial problem," making it difficult to determine whether the agency would have made the same decision without the error. *Id.* at 641–42.

This case presents the same difficulty. The State Department never said

- whether the State Department's five reasons were independent or

- what the State Department would have decided if it had not considered the inevitability of inaccuracies, surmised a lack of medical consensus, and assumed the infeasibility of a third sex designation.

It certainly appears that concern for accuracy was key to the State Department's decision. Congress has criminalized false information in a passport application, 18 U.S.C. § 1542, and the State Department separately requires applicants to truthfully answer every question on the application. 22 C.F.R. § 51.20(b). In the face of a criminal penalty and regulatory requirement, we cannot simply assume that the State Department would have relied on the binary sex policy even after learning that it would create inaccuracies in passports.

These inaccuracies are inevitable because some people, like Zzyym, are indisputably intersex. But the State Department has not acknowledged the inherent inaccuracies that arise when applying the binary sex policy to these individuals.

Without this acknowledgment or an explanation for forcing indisputably intersex applicants to apply as either male or female, the State Department undermined the accuracy of Zzyym's identifying information and assumed without any evidence that an intersex designation would be too costly and lack a medical consensus.

At the same time, we differ with the district court as to the disposition. The district court concluded that the State Department lacked any supportable reasons to rely on the binary sex policy. We disagree. In our view, the State Department reasonably concluded that its policy matched how most jurisdictions identified an individual's sex, facilitating the State Department's assessment of eligibility for passports and other agencies' use of passport data. We thus

- vacate the district court's entry of judgment for Zzyym and the court's issuance of a permanent injunction against enforcement of the binary sex policy as to Zzyym and

- remand with instructions to vacate the State Department's decision and reconsider Zzyym's application for an intersex passport.[13]

---

[13] We express no opinion on whether the State Department's second and third reasons—in themselves—would justify the State Department's

41

decision to require Zzyym to check either the male or female box on the application. The ultimate evaluation would require assessment of a different set of findings. Those findings would necessarily be based on the administrative record in existence when the State Department reconsiders its decision. *See* n.4, above.